**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| -v.- | 1:18-cr-00600-LGS-1 |
| : | Judge Lorna G. Schofield |
| JEFFERSON MORRILL, : | |
| Defendant. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### MOTION OF DEFENDANT JEFFERSON MORRILL FOR A MITIGATED SENTENCE AND VARIANCE BELOW THE SENTENCING GUIDELINES

Defendant Jefferson Morrill comes before the Court for sentencing after having entered a plea of guilty to Count Two of the criminal information charging importation and distribution of numerous counterfeit sports jerseys, in violation of 18 U.S.C. §§ 2320 & 2. Mr. Morrill submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a). The U.S. Probation Office has calculated, under the U.S. Sentencing Guidelines, a sentencing range of 12 to 18 months. (Docket Entry 21, *Revised* Presentence Investigation Report).

This case comes to the Court via a *Criminal Information* evidencing an early and timely intent to plead guilty. (Docket Entry 4). Mr. Morrill respectfully requests that the Court impose a mitigated sentence of probation and variance below the Guidelines, considering factors under 18 U.S.C. § 3553(a). In *United States v. Booker*, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005), the Supreme Court held that the Sentencing Guidelines were advisory. Accordingly, "a district court is permitted to vary from those guidelines in order to impose a sentence which fits the mandate of [§] 3553(a)." *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006).

**Background**

Jefferson Morrill was the first-born child into a family that honored hard work, determination and respect of others. He comes from humble beginnings. Mr. Morrill was born in Charleston, South Carolina, in 1970. In the early days, his father was in the Navy and the family lived in trailers and rental houses. He moved to New Jersey at age 3 where his father began a landscaping company and eventually started a real estate business which improved the family's financial circumstances. His mother worked as an office manager.

Mr. Morrill was a typical child. He played baseball, basketball and soccer. His parents remained married throughout his childhood and he enjoyed strong family support. When Mr. Morrill was a freshman in high school, his parents moved the family and the real estate business to Tucson, Arizona. After dropping out of the University of Arizona in 1988, Mr. Morrill worked in his father's real estate business and began remodeling homes in the Tucson area. A tireless worker, Mr. Morrill held jobs in the restaurant industry, a golf course at a country club, and at a grocery store.

> Jeff always worked as a teenager and bought his first car with his own money. He never asked for any monetary help from his parents. From the time he was a youngster up to and including the present, Jeff is a hard worker and a great father to his two daughters, encouraging them to excel at school and socially.... I am 71 years of age, and Jeff calls me four to five times a week.

*Letter,* Walter Morrill, Father. (Docket Entry 22-1, Page 1).

> [Jeff] has always had the best work ethic of anyone.... I remember him working 50 hours a week as a bus boy and a waiter when he was 17 years old.... Jeff works 80-90 hours a week and always made sure [his daughters] had everything and then some that they needed while never splurging on himself or taking breaks from work.

*Letter,* Justin S. Morrill, Brother. *Id.* at Page 4.

> I have worked with Jeff for three years now.... He is one of the hardest working people I know. He is a man of integrity, high morals and is one of the most unselfish people I know. Jeff is always there for his colleagues and friends.

*Letter,* Hishyar Chelky, Friend & Colleague. *Id.* at Page 13-14.

Mr. Morrill is the proud father of two outstanding daughters, Haley, age 21, who attends American University in Washington D.C. as a pre-med student and is in the top of her class; and, Mya, age 17, who is a junior at University School of Nashville, a rigorous academic high school, where she too is at the top of her class. Mr. Morrill is a devoted, doting father and considers his girls to be his bedrock and in turn, they rely on him for unconditional love, support and continuing financial assistance. Mr. Morrill is actively involved in the lives of his daughters.

> [M]y dad's presence in my life is invaluable.... I can't help but worry about finances, and the complications that will arise for me and my family if my dad is not here to help us. I rely on him to pay for half of my college tuition.... My parents have been divorced since I was 9 years old. Since then, my dad has done his very best to be supportive of my sister and me.... [T]he time we get to spend with our dad is precious.

*Letter,* Haley Morrill, Older Daughter. *Id.* at Page 8.

> When my parents got divorced, I never felt like there was something missing in my life, unlike many of my other friends, whose parents were divorced.... [H]e would always be there for me. I can see the excitement in his eyes when he sees me and my sister and the love and sense of [pride] he gives off.... [H]is presence in my life is extremely important to me.

*Letter,* Mya Morrill, Younger Daughter. *Id.* at Page 9.

Remarkably, Mr. Morrill's two ex-wives speak glowingly of his character and his unwavering devotion to his daughters. Both express concerns about losing his continuing financial support.

> [H]e cares deeply for his daughters.... [I]ncarceration would be very detrimental to the emotional health and well-being of his two daughters.... Both are beautiful, intelligent, conscientious, and kind young ladies that would make any parent proud.... I rely on Jefferson's contribution to college expenses for Haley, and child support for Mya.

*Letter,* Christine Morrill Stengel, First Ex-Wife. *Id.* at Page 7.

> Jefferson is a very good man.... [W]e divorced due to me suffering from severe depression. He still supports me financially because of my condition.

*Letter,* Shelley Morrill, Second Ex-Wife. *Id.* at Page 10. Additionally, his current girlfriend and her children have also grown to rely on Mr. Morrill.

> Our interaction and relationships never changed [as a result of the arrest] because we simply love, adore and admire [Jeff] ... because he is an honest, humble, loving, caring, kind, generous person that would never hurt or misguide anyone.... [He] is very much involved in my children's education and everyday lives.... I also work for [Jeff] as a clerical assistant/general laborer.... I will not have a job, an income and possibly no home for my three children and myself [if Jeff is incarcerated].

*Letter,* Heather Lewis, Girlfriend. *Id.* at Page 5-6.

A long-time friend and business colleague, Joe Coppola, recalls in his letter to the Court a kindness that Jeff extended to him when he was first trying to break into the sports autograph business.

> Being new to the business, I didn't have [the] capital at the time to invest, so Jeff decided to float me money where I could obtain the autographs and make payments [back] to him.... Jeff gave me the ability to get started and assist[ed] me in growing and being

4

>    successful as I am today. This goes a long way and no one else
>    would have done this for me. No chance at all.

*Letter,* Joe Coppola, Friend & Business Associate. *Id.* at Page 16.

      In the early 1990s, Mr. Morrill, his father and younger brother began collecting baseball cards, attending local card shows and acquiring inventory to sell. Mr. Morrill soon opened his own business buying and selling baseball cards. He worked long hours to make the business successful. Mr. Morrill expanded the business to include buying and selling the autographs of popular athletes and sports figures. He later started a company which focused on selling licensed sports memorabilia and authentic autographs. His inventory was purchased legally. He would pay athletes by the hour or by the item to provide autographs and then pay to have the signatures properly authenticated. These legally purchased memorabilia items and authentic autographs were and continue to be the cornerstone of Mr. Morrill's business and the primary source of his revenue. As his business developed, he noticed a trend in the industry of placing authentic autographs on so-called "custom" jerseys. Morrill and other dealers used the custom sports jerseys as a vessel on which to sell and display authentic autographs that were in demand. Significantly, Mr. Morrill never represented the custom jerseys as being authentic, official, or associated with a recognizable and protected brand name. However, some of these "custom" sports jerseys contained trademarked images and were, therefore, considered counterfeit goods under federal law.

      On July 26, 2018 at 6:00 a.m., Mr. Morrill was arrested at his home in Nashville on a warrant issued in the Southern District of New York based upon a criminal compliant alleging a counterfeit trafficking conspiracy and a substantive offense of trafficking in counterfeit goods. (Docket Entry 1). He was arrested without incident and cooperated fully with the arresting

agents. His inventory was seized which included many items bearing the authentic autographs of popular sports figures. He was released on conditions in the Middle District of Tennessee and has been unfailingly compliant. He made his initial appearance in the Southern District of New York on December 4, 2018 and continued the process of endeavoring to provide substantial assistance to the United States. Shortly after returning to Nashville following his initial appearance and proffer session with the United States, the physical and emotional stress became too much. He was stricken with sudden and persistent chest pain and made an appointment with a doctor who performed an echocardiogram (EKG). Alarmed by the result, the doctor immediately sent him to the emergency room where he was diagnosed with heart disease and surgery was performed the next day. The blockage was so severe that bypass surgery was not an option and he received three stents. Since this episode, he has maintained a strict diet, resolved to reduce stress, and takes four maintenance heart medicines, a daily regimen he will continue for the rest of his life.

Former New Jersey State and District of New Jersey federal Court Reporter, Mollie Ann Bracigliano, has seen her share of criminal defendants in the dock awaiting sentencing.

> You [Judge Schofield] have seen more than your fair share of defendants who are not remorseful. Jefferson Morrill is not one of those defendants.... I tell you this because I have witnessed a lot; people remorseful; others not so much. Jeff is determined to learn from what happened and move on.... Your Honor, defendants are sentenced to prison to be rehabilitated and to deter them from committing another criminal act. [Jeff] is a sweet, kind, humble man who has made some bad decisions and is paying dearly for them. It is very safe to say that you will never see him in this Court ever again.

*Letter,* Mollie Ann Bracigliano, Long-time Friend. *Id.* at Page 11-12.

*VARIANCE*

*The circumstances of this case are sufficiently extraordinary to warrant a variance based on **Mr. Morrill's Efforts at Early Cooperation with and Assistance to the Government Which Constitutes an Extraordinary Acceptance of Responsibility; The Need to Avoid Unwarranted Sentence Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct; Mr. Morrill's Physical Condition; and, Mr. Morrill Poses No Risk of Recidivism.***

*A Sentence of Probation is Warranted in Light of the 18 U.S.C. § 3553(a) Factors*

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary to comply" with the purposes of sentencing set forth in the second paragraph of the statute. In undertaking its analysis, the Court must give consideration to the advisory sentencing range recommended by the Guidelines and any relevant Guideline Policy Statements, as well as other traditional sentencing factors. *See* 18 U.S.C. § 3553(a).

Nearly twenty years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en banc).* The Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Gall v. United States,* 532 U.S. 38, 49 (2007); *accord Cunningham v. California*, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Instead the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id.* Moreover, the Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character

7

and conduct can be rationally reduced to some arithmetic formula."[1] *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense.") The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence of probation.

    *A.     Extraordinary Acceptance of Responsibility.*

As noted above in the *Background* section of this filing, Mr. Morrill began the process of attempting to provide substantial assistance to the United States on the day of his arrest in Nashville. Mr. Morrill took responsibility and cooperated with the agents who entered his home on July 26, 2018. He assisted the federal agents during their search of his home, locating and removing the specific counterfeit items which were scattered among a large number of legitimate items. Without invoking his right to remain silent or demanding to speak to a lawyer, he unreservedly, honestly and candidly answered all questions put to him by the agents regarding his business and the challenged items he was having manufactured overseas. Mr. Morrill provided information about his involvement in and knowledge of the sports memorabilia

---

[1] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No,* ABA Journal, Oct. 2013, at 53.

industry, identified individuals of interest to law enforcement in the industry, and offered to continue to cooperate with federal agents.

Mr. Morrill continued to cooperate with the government following his arrest. He waived indictment and consented to the filing of a criminal information. This gesture saved the government additional time and resources. Very early in this process, counsel for Mr. Morrill made it abundantly clear that Morrill desired to actively cooperate with the government and offer any assistance, including pro-active assistance, to investigators which might lead to the prosecution of others in the sports memorabilia industry. Toward that end, Mr. Morrill and his attorneys traveled to New York to meet with the government for the purpose of a proffer. Mr. Morrill was extremely well prepared and provided complete, honest and useful information. At the conclusion of the proffer, Mr. Morrill was told he would be contacted directly by agents to pursue his offer of pro-active assistance. Despite his willingness to cooperate, neither Mr. Morrill nor counsel were contacted by investigators. As is its province, the United States has declined to file a motion for a downward departure based upon substantial assistance in Mr. Morrill's case.

Mr. Morrill recognizes that U.S.S.G. § 3E1.1 already provides for a downward adjustment for those defendants who accept responsibility and plead guilty in a timely manner. However, U.S.S.G. § 5K2.0, explicitly contemplates that a sentencing court may depart from the guidelines "in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of … that which ordinarily is involved in that kind of offense." U.S.S.G § 5K2.0(a)(3). Therefore, a variance is justified in cases of extraordinary acceptance of responsibility. *See United States v.*

*DeMonte*, 25 F.3d 343, 349 (6th Cir. 1994) ("unusual willingness to cooperate" justified departure); *United States v. Lieberman*, 971 F.2d 989, 995-996 (3rd Cir. 1992); *United States v. Haut*, 107 F.3d 213, 222 (3rd Cir. 1997); *United States v. Brown*, 985 F.2d 478, 482-483 (9th Cir. 1993).

Although the government's election to not embrace Mr. Morrill's efforts to cooperate means that he will not receive a government motion for a substantial assistance reduction, the Court still retains the authority to vary from the advisory guidelines grounded in its broader discretion in considering the § 3553(a) factors. "A district court may, in its discretion, consider whether a defendant's cooperation should be considered under 18 U.S.C. § 3553(a)." *United States v. Petrus,* 588 F.3d 347, 356 (6th Cir. 2009); *see also United States v. Martin,* 318 Fed.Appx. 313, 314 (6th Cir. 2008) (noting that the district court granted a 22-month downward variance based on substantial assistance where government refused to move for departure). In *United States v. Massey*, the Sixth Circuit explained that it has "recently re-affirmed that 'although departures under § 5K1.1 require a motion from the government, variances do not.'" 663 F.3d 852, 858 (6th Cir. 2011) (citing *United States v. Gapinski*, 422 Fed.Appx. 513, 518 (6th Cir. 2011).

Cooperation is also particularly relevant under the § 3553(a) factors because it is the best barometer that a "defendant will transgress no more [, will] respond to rehabilitative efforts [, and] not deem himself at war with his society." *Roberts v. United States,* 445 U.S. 552, 558 (1980). Mr. Morrill has clearly demonstrated through his extraordinary acceptance of responsibility and his early efforts to cooperate with the government that he wishes to make up for his transgressions. This further bolsters his plea for a mitigated sentence.

B.     *The Need to Avoid Unwarranted Disparities*

A critical sentencing factor in this case is the need to avoid disparity with the types of sentences imposed in similar cases. In similar cases, below-Guidelines variances appear to be common. The types of sentences imposed in fraud cases beyond this district are instructive and appropriately considered by the Court. *See, e.g., United States v. Doan,* 498 F.Supp.2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions....").

Mr. Morrill accepts full responsibility for his illegal conduct in trafficking in counterfeit goods. Mr. Morrill's victims were the sports organizations that would have profited from the licensing of the trademarked jerseys. However, Mr. Morrill was not defrauding customers by falsely advertising his jerseys or by selling forged autographs. Two similar cases which involved actual fraud and the marketing of "knock-off" jerseys as authentic, have resulted in the offender receiving probation at sentencing.

### *United States v. CK Productions, Inc.,* **District of Massachusetts Case No. 1:16-cr-10286-MLW**

A New Hampshire company was sentenced in federal court in Boston for trafficking counterfeit New England Patriots AFC Championship and Super Bowl t-shirts during the 2015 NFL playoffs. At the sentencing hearing, CK Productions Inc., based in Pelham, N.H., was ordered by U.S. Senior District Court Judge Mark L. Wolf to pay restitution in the amount of $29,405 to the NFL and a fine of $30,000. In April 2017, CK productions pleaded guilty to trafficking in counterfeit goods.

From January through February 2015, CK Productions printed and sold approximately 1,724 counterfeit t-shirts, with a total retail value of approximately $29,405. The playoff t-shirts bore the trademarked words "Patriots" and "Super Bowl" and pictured the Patriots logo.

11

*United States v. Korb*, **District of South Carolina (Greenville) Case No. 6:17-cr-00343-HMH**

A 38-year-old South Carolina man pled guilty in federal court to trafficking in counterfeit goods including some autographed memorabilia that was not real.

Evidence presented at a change of plea hearing established that Joshua D. Korb ran an online eBay store called Steel-Town Memorabilia. The investigation was initiated from a request by the NFL because of numerous complaints received by eBay and PayPal that Korb sold counterfeit NFL merchandise and sports memorabilia.

Agents from the United States Postal Inspection Service made six undercover purchases from Steel-Town Memorabilia of NFL merchandise advertised as authentic. Experts examined all the merchandise and determined all of the items were counterfeit because they were not manufactured by the trademark holder, not licensed or authorized by the NFL, contained a fake certificate of authenticity, or contained a forged signature.

Based on the results from the undercover buys, federal agents obtained and executed a search warrant on Korb's home in Greenville where they seized 2,911 pieces of NFL memorabilia including counterfeit jerseys, forged signatures of current and former NFL players on NFL replica footballs and jerseys, and forged signatures of current and former NFL players on photos and posters. Agents also seized counterfeit certificate of authenticity seals.

In an interview with agents, Korb admitted that he purchased and sold counterfeit merchandise through his Steel-Town Memorabilia store. He told agents he forged the names of current and former NFL players to the items he was selling.

Korb told agents he started Steel-Town Memorabilia as a part-time business in 2006 after the Pittsburgh Steelers won Super Bowl XL but it expanded into a full-time business after the Steelers won Super Bowl XLIII in 2009.

Law enforcement estimates that Korb trafficked in more than $4 million worth of counterfeit goods before the search warrant shut down his business.

In October 2017, Mr. Korb was sentenced to five years' probation.

### C. Physical Condition.

As noted in the *Revised* Presentence Report and discussed in the *Background* section above, Mr. Morrill underwent urgent heart surgery in October 2018 and three stents were placed to open significant, life-threatening blockages in his heart. (Docket Entry 21, *Revised* PSR ¶ 68). *See United States v. Sabino,* 274 F.3d 1053, 1078-79 (6th Cir. 2001) (upheld a three-level downward departure due to defendant's age and physical deficiencies including ailments with his eyes and ears, and other factors).

### D. *Jefferson Morrill Poses No Risk of Recidivism.*

Jefferson Morrill is a 48-year-old divorced father of two with no criminal history points. There is no risk of recidivism in this case given the sobering lesson Mr. Morrill has already learned, especially in light of his age. For all offenders in Criminal History Category I, the recidivism rate is 15.2%. For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Mr. Morrill who are educated, have been employed, have children, and over 50, the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) [hereinafter *Measuring Recidivism*]. Finally, offenders like Mr. Morrill with no criminal history points have a lower rate of recidivism. *See* Sent'g Comm'n, *Recidivism and the "First Offender"* (May 2004) [hereinafter *First Offender*].

Based on all of the factors present with Mr. Morrill, the Court can reasonably find that he poses no risk of re-offending in any manner. Accordingly, the sentencing concerns of "incapacitation" and "protecting the public from further criminal activities by the defendant" are non-existent in this case, which means the need for a prison sentence of any length is significantly diminished here.

The case law, too, makes clear that in imposing the lowest sentence sufficient to account for the need to protect the public from further crimes of Mr. Morrill, this Court should consider the statistically low risk of recidivism presented by Mr. Morrill's history and characteristics. *See, e.g., United States v. Darway,* 255 Fed.Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton,* 323 Fed.Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt,* 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina,* 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera,* 567 F.Supp.2d 271, 279 (D. Mass 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,*

14

814 F.Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Indeed, the loss of his professional reputation is a factor the Court not only can – but should – consider in fashioning a reasonable sentence for this defendant in this case. *See United States v. Gaind,* 829 F.Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil,* 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras,* 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

## Conclusion

Mr. Morrill is a non-violent offender with no criminal history points who has fully accepted responsibility and genuinely endeavored to provide substantial assistance to the United States. Neither the government nor "society" would benefit from bearing the costs of his incarceration. A sentence of probation would be appropriate in this case and would not deprecate the seriousness of the offense.

Respectfully submitted,

TUNE, ENTREKIN & WHITE, P.C.
UBS Tower, Suite 1700
315 Deaderick Street
Nashville, Tennessee 37238
(615) 244-2770

S:/ Peter Strianse
PETER J. STRIANSE

FREEMAN & FUSON
2126 21st Avenue South
Nashville, TN 37212
(615) 298-7272

S:/ Joseph W. Fuson
JOSEPH W. FUSON

Attorneys for Defendant Morrill

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been sent via the Court's electronic filing system unless not registered and, in that event deposited in the United States mail, postage prepaid, to:

>Daniel G. Nessim
>Assistant United States Attorney
>The Silvio J. Mollo Building
>One Saint Andrew's Plaza
>New York, NY 10007
>
>**VIA EMAIL**
>Colleen Tyler
>U.S. Probation Officer Specialist
>Southern District of New York
>Colleen_Tyler@nysp.uscourts.gov

this 29th day of April, 2019.

>S:/ Peter J. Strianse
>PETER J. STRIANSE